IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## NORTHERN DISTRICT—SUNBURY, 1874.

## Greenough *versus* Fulton Coal Company *et al.*

1. Fixing a rate of taxation is not charging unseated land with the tax, although the rate is essential to the charge.

2. Property in the unseated list must be individuated before it can be the subject of a charge.

3. The triennial assessment is the basis of subsequent annual assessments and the valuation will remain unless changed by alterations in the property; —but it does not *per se* constitute the annual assessment.

4. The charging of land with taxes is an annual process.

5. The commissioners have no right to reject the annual returns and make their charges on the triennial return.

6. The question was whether land sold for taxes as unseated was seated when the tax was assessed; the commissioners' unseated-land books did not show when the tax was assessed. *Held*, that the commissioners' minutes were evidence when the assessment was made.

January 27th 1874. Before AGNEW, C. J., MERCUR and GORDON, JJ. SHARSWOOD, J., at Nisi Prius.

Error to the Court of Common Pleas of *Northumberland county:* Of September Term 1873, No. 6.

This was an action of ejectment, brought December 22d 1868, by William I. Greenough against The Fulton Coal Company and others, for a tract of land, "consisting of tracts and parts of tracts," &c., containing 1674 acres or thereabouts.

The premises in controversy were tracts and parts of tracts, surveyed on warrants in the names of Henry Antis, Thomas Adams, James Jenkins, Robert Adams, Frederick Antis and Thomas Foster. The whole number of the original tracts was twenty-five. In the year 1832 the owners of the twenty-five tracts instituted

proceedings in partition in the Court of Common Pleas of Northumberland county, in which Nos. 4, 8 and 10, marked "purpart B," were allotted to Thomas Cadwallader, who, on the 5th of April 1837, conveyed No. 8 to John A. Lane, Samuel Parke and George Heckert. On the 24th of March 1853 the title to No. 8 vested in William L. Helfenstein, who conveyed three-fourths to David Longenecker and others, and on the 23d of October 1854 all the owners conveyed the whole tract to The Northumberland Improvement Company, whose name was changed by Act of Assembly, March 17th 1859, to The Fulton Coal Company, one of the defendants.

The plaintiff claimed under a sale of the land for taxes as unseated, and deed made to him October 20th 1866 by John Farnsworth, treasurer of Northumberland county.

The case was tried March 21st 1871, before Rockefeller, P. J.

The plaintiff gave in evidence book "B" from the commissioners' office, with the testimony of D. M. Swartz that it was the unseated-land book, in which the valuations and assessments of those lands were kept. The book commenced in 1852. The same witness testified that the triennial assessments were in separate small books. Plaintiff gave in evidence unseated-land book "A," from 1805 to 1813, both inclusive. Also unseated-land book from 1796 to 1804, marked "Transcript of unseated lands from deputy surveyor's returns."

J. Farnsworth, who had been county treasurer and commissioners' clerk since 1843, testified that "B" was the book from which the treasurer made out his list of sales for advertising. The valuations were regularly transcribed and continued from previous years, unless alterations were made by the commissioners on the application of the landowners.

"When these books were transcribed and the valuations brought forward by the clerk, it was done under the authority and by the sanction of the county commissioners. The commissioners fixed the rates, and I, as clerk, made out the taxes from the valuations as they appeared the year before. Before and while I was treasurer I knew but little about how it was done. I saw what had been done in the book. This book 'B' was in the commissioners' office, and given to me to make the taxes from. It is the book of the commissioners. It is not a book of the treasurer."

In book "B" were these entries :—

"The following tracts of unseated land are situated in the several townships set opposite the respective tracts, and in the proportions stated, as nearly as can be ascertained."

Under head of division, "B, No. 8."

Under warrantees' name, "whole or part" :—

Antes Henry; Foster Thomas; Antis Frederick; Adams Thomas; Jenkins James; Adams Robert.

[Greenough *v.* Fulton Coal Co.]

Under head of "owners":—

Lane, Park and Heckert.

Under head of "acres"—1674.

Adjoiners and townships:—

John Brady, John White, D. Reese, W. Tomlinson; township of Coal.

Then follow entries from 1852 to 1857, including both, of county, state, road and school taxes.

Another page had the same heading, and other entries, with the addition of the valuation, $16,740—and being for 1858, 1859.

Another—same, for 1860, 1861.

Another—same, for 1862, 1863.

Another—same, for 1864, with the addition of bounty tax.

Then this entry: "1865. Marked on seated book for 1865, 'Sold, June 11th 1866, to Wm. I. Greenough. Rec'd payment, J. Farnsworth, treasurer—$957.06.'"

Farnsworth testified that he received the above purchase-money from the plaintiff for these tracts, sold to him by witness as treasurer.

He further said: "I always filled up the valuation column when I commenced. I commenced in the regular order and put down the warrantee names and then the owners'; next the acres; next adjoiners; then the valuation column; then the taxes. There are two years' taxes on each sheet or page; they represent one sale by each treasurer. I did not make these entries all at once. When I made the entries I did not make all in one year. Some of the local taxes I could not put down, as they were not given to me. I did not make the entries for the two years last past all in one year. * * * I did not get all in the book until a few months before the sale. I had some in before the 1st of last January; not three months before. * * * I always carried forward the previous valuations, unless otherwise directed by the county commissioners. * * * I know it was in my regular routine of business. In my experience the heading and the taxes columns would be carried out for the two years, the first. I always took the valuation from the valuation of the previous years, without any direct orders from the county commissioners to that effect. The object of keeping this book was to make up the record for the treasurer's sale. When this book was once made out and finished, then the treasurer made up his sale-book from it. It is not the habit of the county for the county commissioners to receive taxes for unseated lands. A man having taxes to pay must go to the county treasurer. The treasurer would have nothing in his office to enable him to receive taxes, other than what he obtained from this book. Until this book was made up, there was no manner by which a man could pay his taxes on unseated land. * * * To make this book two things were necessary. 1. The valuation; and next, the rate

[Greenough v. Fulton Coal Co.]

of taxes. We always had the rate of taxation established by the commissioners, and the valuation we took from the previous years without any special orders upon that subject by the commissioners. I do not know that the assessors of the county ever acted upon the valuation of unseated lands. I did at one time request them to return the unseated lands, and furnished them with lists. It was since 1867. They returned them in such condition that I could not use them. Before that time I do not know of any instance in which the assessor appraised or valued the unseated lands of the county. I know of one or two instances in which the taxes were entered in this book only a day or two before the sale. I know that some were entered so late that they could not be taken into the account, and had to be carried on to succeeding sale. * * * My impression is that each and every year, immediately after the assessments of the county taxes, the county taxes were carried out in this book. * * * After the rates of taxes were fixed by the county commissioners, the treasurer could ascertain, by a matter of calculation, the county taxes. * * * The county tax was always ascertained after the rate was fixed. * * * I think that soon after the commissioners fixed the county rates, I carried the county taxes out in the columns. I cannot state any particular time that the entries were made. When I was treasurer I frequently examined their books. I had no difficulty at any time in ascertaining the amount of county and state tax. This book was made up as a record to show all parties how much they had to pay on their tracts. Sometimes the road, poor, school and bounty taxes were in them. The bounty taxes of Coal township were not in time for the sale previous to the last, and were carried into the last sale. * * * When I said that the county taxes could be ascertained after the rates were fixed by the commissioners, I mean by taking the previous valuation."

The plaintiff then gave in evidence the following from the minute book of the commissioners:—

"February 3d 1864. The board of commissioners agree to fix the rate of county tax at two mills on the dollar, the same as the year 1863."

"25th of March 1864. A full board of commissioners met and signed the assessment books, and attended to the other business of the office."

Also treasurer's sale-book of 1866, containing treasurer's sales by John Farnsworth, treasurer of Northumberland county.

Coal township—1674 acres.

Henry Antis, James Jenkins, Frederick Antis, Thomas Adams, Robert Adams, Thomas Foster.

Under the head of treasurer's returns of purchasers: "Wm. I. Greenough."

[Greenough *v.* Fulton Coal Co.]

"Amount of taxes, $953.18; costs, $3.88; sold for $947.06; stamp, $1; money received by treasurer, $958.06."

Also treasurer's deed to plaintiff for same tracts, dated October 20th 1866, and acknowledged November 16th.

It was admitted that lot No. 8 is well marked on the ground and well known as a body of land since the partition; and that the writ of ejectment contains an accurate description of lot No. 8.

Plaintiff then gave in evidence the treasurer's-sales books, showing the statement of the land in 1854, the same quantity and warrantees' names as before stated, and taxes paid by W. L. Helfenstein. Same in 1856, and taxes paid before sale by J. S. Dickson for Northumberland county. In 1858: "B, No. 8, 1674 acres;" same warrantees; "sold for $1700, Hiram B. Tilden purchaser; money received by the treasurer."

It was admitted that Tilden was a director and the agent of the Fulton Coal Company when he purchased the lands at treasurer's sale.

Plaintiff gave evidence of entries of these lands in 1860, 1862 and 1864 in the treasurer's sales-book, similar as to quantity, 1674 acres, and warrantees' names, and taxes paid in those years by the Fulton Coal Company.

The plaintiff having closed, the defendants gave in evidence their paper title up to and including the deed from Helfenstein and others, October 23d 1854; and after further preliminary evidence, offered—

"Minutes of the proceedings of the county commissioners of Northumberland county, contained in the same book given in evidence by the plaintiff, on the 20th of April 1864, which read as follows: 'The board of commissioners fix the rate of county tax at two mills on the dollar for the year 1864,'" for the purpose of showing the date at which the rate of county tax was fixed for the year 1864.

Plaintiff objected because the same book of minutes shows that the rate was fixed by the commissioners at the same rate on the 3d day of February 1864, and had signed the assessment-books on the 25th of March 1864.

Also, "Minutes of county commissioners, contained in the same book, of the date of November 20th 1865 and November 30th 1865, and December 13th 1865; offered for the purpose of showing the action of the county commissioners in fixing the valuation and taxes and the rates on the lands in controversy for the years 1864 and 1865, and also the time at which said action was taken."

Plaintiff objected, because the commissioners, in November 1865, had no power to change either the valuation or the rate of taxation of 1864, and also because the evidence offered shows that the commissioners discovered their mistake and revoked their

[Greenough *v.* Fulton Coal Co.]

determination to change the valuation before anything else had been done under it. Also, because the action of the commissioners of the 30th of November, A. D. 1865, proposes to fix the taxes, in four of the townships or districts of the county, at double the rate of taxation of 1862 and 1863, leaving the other unseated land the same that it was in 1862 and 1863, and was therefore void, inasmuch as the law requires them to have the same rates in all the townships, and that the year 1862 having been a triennial year, the commissioners had no power to change the rate or valuation upon these lands for the year 1864 at any time.

The court admitted both offers and sealed several bills of exceptions.

The minutes were as follows :—

"November 20th 1865. Adjourned to meet on the 30th November, to fix the taxes on unseated lands of the county for the years 1864, 1865.

"November 30th 1865. A full board of the commissioners met to regulate the tax on the unseated lands of said county; they have fixed the tax or valuation for Mount Carmel, Coal, Shamokin borough and Zerbe at double what it was in 1862 and 1863, and all the other unseated land the same as it was in 1862 and 1863. This is the valuation for 1864 and 1865.

"December 13th 1865. A full board of the commissioners again altered the taxes on unseated lands, and unanimously agreed to let the rate of taxes on unseated land the same as it was in 1862 and 1863."

J. H. Dewees testified that he made an application to the Fulton Coal Company for a lease of lands from them; he agreed verbally with them, about 4th or 5th of March 1864; he commenced work on the property March 8th 1864, and continued to work until March 30th, when he received a written lease. He contracted about the middle of March for work and materials for a breaker. He testified as to the erection of the breaker, the placing a portable mill, lumber, &c., on the ground, and other matters, for the purpose of showing that the land was seated, and when. He testified also as to the location of the land which he had leased.

The lease was dated March 30th 1864, and was for twelve years from April 1st 1864.

Defendants gave in evidence a lease of lands dated October 25th 1864, from them to Ira T. Clement, for twelve years from October 1st 1864.

Clement testified that on the 16th of June 1864 he commenced putting up a house, and on the 2d of July a portable mill, and continued making other improvements.

They gave in evidence a lease, dated November 28th 1864, from the Fulton Coal Company to Thomas Baumgardner, for fifteen years and five months, commencing August 1st 1864, for lands of

[Greenough *v.* Fulton Coal Co.]

the company. Baumgardner testified that he had a verbal lease in June or July previously, and commenced work about August 1st 1864.

H. Van Gaskin, who was superintendent of the Fulton Coal Company, testified that the works of Dewees, Clement and Baumgardner were on the lands in controversy; he also testified as to matters tending to show that the lands were seated in the spring and summer of 1864.

There was other evidence to the same effect.

The defendants gave in evidence also receipts for taxes paid by them for 1854, 1855, 1858, 1859, 1860, 1861, 1862 and 1863.

The defendants rested.

In rebuttal the plaintiff gave in evidence the triennial assessments from the organization of the county to 1862 inclusive, for the purpose of showing that the unseated lands in the county were not returned in the triennial-assessment book, but that these triennial assessments contain only assessments of seated lands.

Judge Jordan, who had been the attorney of the county commissioners, testified that he was familiar with the practice in the commissioners' office; that unseated lands were valued and assessed by the commissioners, and the clerks carried out the amount to each tract; they were sometimes returned on the back of the triennial assessments, but there was no valuation. The commissioners set down the valuation of the tracts.

Both parties here closed.

The following are points of the plaintiff with their answers:—

1. The valuation and assessment of taxes upon the land for which this suit is brought, made in 1862, as the triennial assessment, with the entry of such valuation and assessment upon the unseated-land book by the commissioners of Northumberland county, and the fixing of the rate of taxation by the board of commissioners upon the 3d day of February 1864, constituted a complete and legal assessment of the county taxes upon this land as unseated for the year 1864.

Answer: "This point assumes that there was a valuation and assessment of taxes made in 1862 as the triennial assessment. If there was a legal valuation and assessment by the proper authorities of taxes upon the land for which this suit is brought, made in 1862, as the triennial assessment, with the entry of such valuation and assessment upon the unseated-land book by the commissioners of Northumberland county, and the rate of taxation fixed by the board of commissioners upon the 3d day of February 1864, this would constitute a complete and legal assessment of the county taxes upon this land as unseated for the year 1864."

2. The valuation of the lands for which this suit is brought having been made and entered in 1862, the year of the triennial assessment, upon the unseated-land book of Northumberland county,

[Greenough *v.* Fulton Coal Co.]

given in evidence by the plaintiff, the lien of the state taxes for the year 1864 attached to the lands in January 1864, and that the treasurer's sale in June 1866, for the non-payment of the same, was valid and passed the title to the purchaser.

Answer : " If there was a legal valuation and assessment of the lands for which this suit was brought, by the proper authorities, and made and entered in 1862, the year of the triennial assessment, upon the unseated-land book of Northumberland county, given in evidence by the plaintiff as the triennial assessment, then I answer this point as requested."

4. Such assessment (that is, the assessment referred to in plaintiff's third point of the state, county, road, school, poor and bounty taxes for the year 1864, upon the unseated-land book) was sufficient to authorize the sale by the treasurer of Northumberland county, on the 11th of June 1866, of the property in dispute, for the non-payment of the taxes for 1864.

" I answer this point as requested, and I instruct you that such sale passed a good title to the purchaser, provided you find from the evidence that such assessment was made before the land was seated, and was made and the taxes remained due and unpaid for the space of one year before the treasurer's sale."

5. The resolution passed by the commissioners of Northumberland county, on the 30th of November 1865, was inoperative and could not change or affect the assessment of taxes upon the lands in controversy for the year 1864, which had become complete and effectual upon the 3d of February 1864.

" I answer this point as requested, except that I cannot charge you as a matter of law that there was an assessment of taxes upon the lands in controversy for the year 1864, which had become complete and effectual upon the 3d of February 1864. Whether there was or was not a tax actually assessed by the proper authorities in the year 1864, and whether such assessment, if made, was made in 1864 or not until the land was seated, or not until November or December 1865, is to be determined by you under all the evidence in the cause."

The following were defendants' points, with their answers :—

3. To make a valid assessment of unseated lands, it is necessary that the assessor shall return the lands to the commissioners, who establish the rate of tax, and in this case, as no valuation of the lands is shown to have been made by competent authority, the sale by the treasurer in 1866 was void, and the plaintiff cannot recover.

" I answer that to make a valid assessment of unseated lands, it *is necessary that the assessor* shall return the lands to the commissioners, who establish the rate of county tax, as stated in this point. The Act of 1842 makes the record of the county commissioners charging unseated lands with taxes evidence of an assess-

[Greenough *v.* Fulton Coal Co.]

ment, and, as I stated in my general charge, it is unnecessary to show any action, valuation or return by the assessor, and I cannot charge you that there is no valuation of the lands shown to have been made by competent authority, and that the sale by the treasurer in 1866 was void and that the plaintiff cannot recover."

6. The sale of 1866 for non-payment of the taxes of 1864 must depend upon the validity of the assessment for the year 1864, and no defects in such an assessment can be cured by reference to assessments of previous year; and therefore, as there is no designation or description of the lands in controversy as purpart 8, letter B, in the alleged assessment for 1864, such designation or description of assessments of previous years cannot be resorted to to affect the assessment of 1864.

12. The seating of the lands in controversy by the entry upon them and occupation by Mr. John H. Dewees, is not to be confined to the limits of the territory within which he had a right to mine coal, but extends to the whole body of lands, irrespective of the restriction of his mining rights.

13. As the county officials, for years prior to 1864, have treated the body of lands in controversy as one tract, it is, for all purposes of seating and taxation, to be considered as one tract, so far as the county and those claiming under it are concerned. The seating of any part of the tract is to be considered as the seating of the whole tract, and the plaintiff, claiming under the county, has no right to allege that the entry of Mr. Dewees and his subsequent work upon the land, was only a seating of that part of it within which he had a right to mine coal.

The defendants' 6th, 12th and 13th points were affirmed.

The court, after referring to the Act of April 13th 1815, amongst other things charged : * * *

"This act is remedial. The owners of unseated lands are bound to take notice of the statutes authorizing them to be sold for taxes. Before, however, they can be deprived of their property it must be shown that there was such a sale as the law directs and authorizes ; and this involves an inquiry as to what constitutes a good and valid sale for taxes. I instruct you that the authority of the treasurer to sell unseated land for taxes depends on the facts—that the land was unseated at the time of the assessment ; that a tax appears to have been and was, in fact, assessed upon it by the proper officers ; and that the tax has been due for one whole year and remains unpaid. If all or either of these facts are absent the sale is invalid, and passes no title to the purchaser.

"First, then, was a tax assessed upon the land in controversy by the proper officers, and, if so, when, and was the tax due for one whole year, and did it remain unpaid up to the time of the treasurer's sales." * * *

The court then traced the title in the warrantees and through the

[Greenough *v.* Fulton Coal Co.]

proceedings in partition to the conveyance April 5th 1837 of pur-part No. 8 by Cadwallader to Lane and others; and proceeded:—

" The plaintiff alleges that in 1852 the lands in controversy were well known by their designation as division or purpart ' B, No. 8,' and in that year, and during all the subsequent years, down to 1864, and including that year, they were placed upon the unseated-land books of Northumberland county, and assessed as one tract; that said lands are entered upon the said books, and, to designate them, the names of the warrantees are used, the names of the owners, Lane, Parke and Heckert, the number of acres as being 1674, and the adjoiners as they are actually upon the ground, and in some years the ' No. 8' and letter ' B.' being the number and letter designating said purpart or share are used, and from this he contends that the lands so appearing upon the said books, kept in the county commissioners' office, are the identical lands in con-troversy. [Whether the lands so appearing upon said books are the same, or the identical lands contained and described in said purpart or share marked ' B. No. 8' or not, must be determined by you from the evidence in the case; the question of identity being for the jury.]

" If these are the same lands, could they be thus assessed as one tract ? The Acts of Assembly relating to the assessment of un-seated lands are plain, and require the assessor to assess and re-turn the lands in his township in single tracts according to their ownership. Each tract must be assessed and returned separately, but, in my opinion, where there has been a division of a body of lands, and they are cut up and divided into several purparts or shares, consisting of parts of tracts comprising said body, and any one of said purparts or shares having been allotted as an entire or piece of the whole to any of the owners, such purpart or share, tract or piece of land, although consisting of parts of several tracts surveyed in different warrantees' names, may be properly assessed and returned as one tract, and especially would this be so if done with the knowledge and consent of the owner who pays the taxes upon it from year to year, knowing it to have been assessed in this way. [Then, if these lands were so entered in the commissioners' books, was there, in fact, a tax assessed ? Have you any legal evi-dence of an assessment ? It has been held that the laws prescribe no mode of keeping assessment-books, or that any shall be kept, except so far as it is involved in the direction that unseated lands ' shall be valued and assessed in the same manner as other pro-perty.' * * *

" It is plain from the reading of all the sections of the act that the valuations are to be made and returned by the township as-sessors, and their returns, with their valuations and the rates fixed, constitute a legal assessment. In the present case there have been no returns of the assessors found in the office, and no evidence

[Greenough *v.* Fulton Coal Co.]

that there ever were any. The commissioners' clerk who entered the lands, the valuations and assessments upon them in the year 1864, is dead, and there is no evidence showing where or how he got the valuations so as to charge the lands with the taxes, but the commissioners' books, which are the records of the county, show that the lands there mentioned and described were charged with the taxes. The Act of Assembly of the 12th of April 1842, which is remedial in all its provisions (Purdon 901, pl. 8), declares that " all records of the county commissioners charging lands as unseated, with arrears of taxes, shall be evidence of an assessment." I am therefore of opinion, and so instruct you, that there is evidence in this case of an assessment upon the tracts of land mentioned and described on the commissioners' books. These books are evidence of an assessment, under the Act of the 12th of April 1851, without other evidence of action on the part of the township assessors.]

" Then if there is evidence of any assessment, when was it made? This is a question to be determined by you under all the evidence in the cause. The rate per cent. being fixed, and a valuation or assessment by the proper authorities constitute an assessment. The work of calculating and carrying out the amount or sums due on each tract is merely clerical and can be done at any time when any person wishes to pay the tax, and the time when the calculations were made and carried out on the books are not so material, the question is, when was the assessment made and the rate of tax fixed, and when made was the land unseated. If it was unseated at the time the assessment was made, then a subsequent occupation or seating of it will not affect the validity of the sale. The fact, whether the land was seated or unseated at the time the tax was assessed, is for the jury. As soon as a person enters upon an unseated tract of land, whether as an intruder or tenant, under a lease from the owner, and becomes a resident upon it, or without becoming a resident improves and occupies it in such a way as to furnish upon the land the means of making and levying the taxes by distress, it is considered in law as seated, and no longer liable to be assessed with taxes and sold for them if they remain unpaid. A tract ceases to be unseated as soon as it is actually occupied with a view to permanent use as the property of the occupant. If the jury believe from the evidence that the land in controversy was actually assessed and the rates fixed by the proper authorities as early as February 3d 1864, when the commissioners fixed the rate of county taxes at two mills on the dollar, and the land was then unseated, the sale on the — day of June 1866, by the county treasurer, being more than one year after the taxes were due and remained unpaid, passed a good title to the purchaser, but, if the jury find that the taxes were not assessed and the rates fixed by the county commissioners until after the lands had become seated, then the

purchaser acquired no title by the tax sale. (The court here referred the jury to the testimony of John H. Dewees and other witnesses as to the times he and the other lessees of the defendants entered upon the land, and the nature and character of their occupancy and improvements.)

["It is contended on the part of the defendants that if there ever was an assessment it was not made until after the lands were seated, and that the records of the county commissioners show that no tax was assessed which was due for one whole year and remained unpaid before the sale." The court referred the jury to the several minutes of the proceedings of the county commissioners, given in evidence, and said, "from these and other evidence in the cause you are to find when the assessment was made and rates fixed. If the valuation of the lands was made by the county commissioners alone, and rates of taxes fixed in November or December 1865, then the taxes would not have been due and unpaid for one whole year at the time of the treasurer's sale in June 1866."]

["To constitute a legal assessment there should be a return by the *township assessors* of the taxable property, together with a just valuation of the same, and, while I think that the Act of 12th April 1842, makes the records of the county commissioners charging taxes on unseated lands *evidence* of an assessment, yet these records are not always the assessment, but only evidence of an assessment, and, in the absence of proof to the contrary, they are conclusive evidence that an assessment was regularly and duly made. The maxim that 'all acts are presumed to have been rightly and regularly done' applies with force to a treasurer's sale, for where acts are of an official nature, or require the action or concurrence of official persons, a presumption arises in favor of their due execution. The unseated-land book kept by the county commissioners, and that in which the valuations and assessments of the unseated lands in the county are kept, show a valuation and assessment of the lands in dispute for the year 1864, and the presumption is, until rebutted by competent and satisfactory evidence, that such assessment was duly and regularly made by the proper officers in that year. But whilst this is a presumption of law, and the Act of Assembly makes the records of the county commissioners evidence of an assessment, I think I cannot take from the jury the right to determine, from all the evidence in the cause, whether a tax was in fact, assessed upon the land by the proper officers, one which was due for one whole year and remained unpaid at the time of the treasurer's sale; and if *you* find that no such assessment was ever made as required by the Act of Assembly *by the proper authorities;* and that the valuation and rates were fixed by the county commissioners alone on the 13th of December 1865, then the sale by the treasurer in June 1866, for those taxes did not

24 P. F. Smith—32

[Greenough *v.* Fulton Coal Co.]

vest a good title to the land in controversy in the plaintiff, for if you believe the evidence, the land was then seated, and not one whole year had elapsed before the sale, and your verdict should be in favor of the defendants; but if you find, from all the evidence in the cause, that the land was unseated at the time of the assessment, that the tax for which the same was sold by the treasurer was, in fact, assessed upon it by the proper officers, and that such tax was due for one whole year and remained unpaid at the time of the treasurer's sale, then your verdict should be in favor of the plaintiff.''']

The verdict was for the defendants.

The plaintiff took a writ of error and assigned for error

1–4. .The answers to the plaintiff's points.

5–8. .The answers to the defendants' points.

9–12. The parts of the charge in brackets.

13, 14. Admitting in evidence the minutes of the county commissioners.

*J. B. Packer* and *J. W. Comly,* for plaintiff in error.

*F. B. Gowen* and *Woodward* (with whom was *S. P. Wolverton*), for defendants in error.

The opinion of the court was delivered, February 9th 1874, by Agnew, C. J.—If we read together the entire charge in this case, including the answers to the points, we find it not contradictory or erroneous. In the main, it was a fair exposition of the law applicable to the facts. The statement that the valuations are to be made and returned by the township assessors, and that these returns, with their valuations and the rates affixed, constitute a legal assessment, was made in answer to a point, and repeated in the charge evidently in consequence of a contest upon the question, what constitutes a true assessment? It cannot be expected that the court shall refrain from any expression of opinion upon subjects of contest before it, nor is it error when the court clearly puts the case to the jury on its true question. The following cases show that the court did not mistake the character of a regular assessment: Wells *v.* Smyth, 5 P. F. Smith 159, where the cases are collected; Lyman *v.* City of Philadelphia, 6 P. F. Smith 501; McReynolds *v.* Longenberger, 7 Id. 13. But the court did not charge that the plaintiff was bound to prove such an assessment in order to support a sale for taxes; and on the contrary, referring to the Act of 12th April 1842, making all the records of the county commissioners *charging* lands as unseated with arrears of taxes evidence of assessment, the judge expressly instructed the jury that there was evidence of an assessment upon

the tracts of land mentioned and described in the commissioners' books, and that those books were evidence of an assessment, by virtue of the act, without other evidence of action on the part of township assessors. The same instruction is conveyed in answer to the third and fourth points, and is repeated and enlarged upon in the last part of the charge. It is in vain to contend that the jury must have been constrained by the definition of a regular assessment to consider it as binding on them in their finding. They were clearly and often informed that under the Act of 1842, the commissioners' book containing the charges against this body of lands, and for which they were sold, was sufficient to support the sale. The judge took fairly the distinction, arising upon the Act of 1842, which is taken by our brother Sharswood in the case of Hess *v.* Herrington, 23 P. F. Smith 438, holding that when such evidence exists, the *irregularity* in the actual assessment, if any, is aided by the fourth section of the Act of 13th March 1815, declaring that "no alleged irregularity in the assessment or in the process or otherwise, shall be construed or taken to affect the title of the purchaser, but the same shall be declared to be good and legal." There was but one particular in which the judge deemed the book deficient, and this he properly submitted to the jury, to wit: the time when the assessment in the commissioners' book was made. There was no evidence whatever on the face of the book of the precise time of making the assessment, or of making the entry in the book, and none appeared in the minutes of the commissioners. The fact was, therefore, necessarily submitted to the jury on the evidence, and with the distinct instruction of the court, that presumptively the assessment was made in the year 1864, a presumption most favorable to the plaintiff; otherwise the evidence itself left the jury pretty much at sea, without star or compass.

The plaintiff contends that this entry in the minutes of February 3d 1864,—"the board of commissioners *agree* to fix the rate of county tax at two mills on the dollar, the same as 1863," determines the time of the assessment. But this entry does not stand alone, and is followed by subsequent entries on the minutes, tending to show that the assessment was not complete on the 3d of February 1864, and that the sum stated was only the intended rate for all county taxes, on seated as well as unseated lands. The entry on the minutes, March 25th 1864, that a full board of commissioners met and signed the assessment-books, shows that the general assessment was not then complete. "Books" here is in the plural, and evidently refers to the assessment-books for the several townships, commonly called duplicates, which is strengthened by the entry on the 20th of April following, that "the board of commissioners fix the rate of county tax at two mills on the dollar for the year 1864." This minute of the final fixing of the rate wears a final aspect not belonging to the minute of 3d February preceding,

[Greenough *v.* Fulton Coal Co.]

which looks more like a prospective intent. It seems to be very evident that the general assessment of county tax for all purposes was not complete until at least the 20th of April 1864, while as to the unseated lands there is strong evidence of incompleteness even then. This uncertainty of time makes it evident that the subsequent minutes of November 20th 1865, November 30th 1865, and December 13th 1865, were not irrrelevant. Taking them in connection with the mode of keeping the commissioners' book by biennial periods, it looks very much as if the commissioners of Northumberland county were very irregular in their mode of dealing with the unseated lands, and as if they thought it quite sufficient to have the unseated-land list completed in time for the treasurer to advertise the list for sale every second year. Undoubtedly they had no authority thus to link together the years 1864 and 1865, and to change the rate for 1864, after they had duly assessed the unseated lands for that year; but such being their irregular action, we cannot say that the court erred in receiving these minutes as evidence upon the question of fact, when they actually completed the assessment for 1864. It cannot be truly said that these entries on the minutes throw no light on the question of fact, and therefore, we cannot pronounce them so irrelevant as to make their admission erroneous. The time of the actual and final assessment was important to the defendants' case, for, if the land was seated, as the evidence tends to show, early in March 1864, before final assessment, or if the assessment was, in point of fact, not made until within a year before the time of sale, the treasurer's sale conveyed no title.

The argument is fallacious that the rate of February 3d 1864, assuming it to be the fixed determination of the rate, is to be referred to the preceding triennial assessment in 1862, and thus to constitute a complete assessment in 1864. Fixing a rate is not charging the land with a tax, though the rate is essential to the charge. The property to be taxed in the unseated list must be ascertained and individuated before it can become the subject of a charge. While the triennial assessment is the basis of the subsequent annual assessment, and the valuation then fixed will remain, unless changed by reason of alterations in the property, it does not *per se* constitute the annual assessment of the property with taxes. The charging of lands with taxes is an annual process, for the reason that neither the property itself, nor its ownership, necessarily continues for triennial periods. The commissioners would have no right to reject the annual returns, and falling back upon the last triennial return, make their charges upon it. The six tracts, the subject of the return in 1862, in one body, might have been disconnected by sales, or changed by improvements; part might, under different owners, become seated and not subject to sale, leaving others unseated and liable to be charged as unseated.

[Greenough v. Fulton Coal Co.]

Of necessity, the charging of the lands as unseated for any year, must be the act of that year, having relation to individual properties as then existing, and cannot be made good by reference to the state of the property in the preceding triennial period. It is true in this case, the property remained without change, but this did not affect the duty of the commissioners to charge it specially with the taxes of 1864. We are, therefore, brought back to the commissioners' book and the assessment of 1864 contained in it, as the only evidence of the assessment for that year, and as there was nothing in it to exhibit the time of the assessment, there must be a resort to independent or outside facts to determine the true time. This brought in, necessarily, all the acts of the commissioners found in the minutes of their proceedings relating to the unseated lands, which could throw any light on the main question, when did they complete their assessment of unseated lands for the year 1864.

These are the only questions we deem it necessary to notice, as their decision rules the case. The verdict of the jury on the facts is not the subject of our inquiry.

Judgment affirmed.